IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES ex rel. JOSEPH S. GORDON**<br><br>Plaintiff,<br><br>v.<br><br>**RAYTHEON COMPANY d/b/a RAYTHEON MISSILE SYSTEMS,**<br><br>Defendants. | **\*\*SEALED\*\***<br>**MEMORANDUM DECISION**<br>**AND ORDER**<br><br>Case No. 1:18-CV-117-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

This matter is before the court on Defendant Raytheon Company's Motion to Dismiss Plaintiff's First Amended Complaint [ECF No. 41]. On December 10, 2020, the court held a hearing on the motion by Zoom video conferencing because of the Covid-19 pandemic. Peter W. Chatfield, John W. Tremblay, and Lara A. Swensen represented Plaintiff Joseph S. Gordon, and Stephen M. Masiello, Gale R. Monahan, and Brett L. Tolman represented Raytheon Company. Having fully considered the parties' written submissions, oral arguments, and the law and facts related to the motions, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Joseph S. Gordon brought this False Claims Act case against his employer Raytheon Company. Raytheon is an aerospace and national defense company that has worked with the United States government for many years. On December 22, 2009, the United States Air Force awarded Raytheon a contract, specifically Contract No. FA8213-10-C-0022 ("Contract"), for the delivery of

Maverick missiles at a firm, fixed price of $169,953,336.  Gordon served as the Program Finance Manager for the Maverick program from 2010 to 2014.

Because Raytheon had not produced the Maverick missile in many years, its estimated costs of performance relating to certain start-up subcontract activities were somewhat uncertain.  To address this uncertainty, the parties included a specially negotiated Downward Adjustment Clause ("Clause") in the otherwise fixed price contract.  The Clause established an estimated "not-to-exceed" amount ("NTE") for four major subcontractors under the Contract: Raytheon Vision Systems, Primus Technology Corporation, Globe Motors, Inc., and General Dynamics ATP.  Pursuant to the Clause, the government could adjust the Contract's fixed-price downward if Raytheon's actual costs for certain subcontract activities related to those four subcontractors were lower than the NTE amount.

> The Downward Adjustment Clause provided as follows:
>
> The government shall obtain a downward adjustment to the total contract price in accordance with the terms of this downward adjustment clause.  The government shall not be liable or obligated to pay any amount greater than the estimated Not-To Exceed (NTE) prices (including the applicable burden rates or profit) as listed below.
>
> The downward adjustment shall be the difference between each estimated subcontractor NTE price listed below and the actual negotiated subcontractor price ordered by the prime contractor (and shall include the applicable burden rates and profit).  In the event the actual subcontractor negotiated price prices are less than the subcontractor estimated NTE prices, the total contract price shall be reduced in favor of the government by the difference between the total of the estimated subcontractor NTE prices and the actual subcontractor negotiated prices (and shall include the applicable burden rates and profit).
>
> . . .
>
> After all purchase orders of the subcontracts have been placed, the contractor agrees to notify the Contracting Office in writing within ten (10) days, so that the downward adjustment may be accomplished in a timely manner in accordance with the terms of this clause.  It is anticipated that a single contract modification will be issued to

reflect the downward adjustment as specified by this clause.

Consistent with this Clause, Raytheon notified the government when all the purchase orders of the subcontracts were placed. The parties then engaged in discussions in the Fall of 2012 regarding whether a downward adjustment was warranted. The government, acting through an Air Force contracting officer, Katie Barker, asserted various positions during the course of these discussions. Raytheon denied that any adjustment was warranted because Raytheon's costs with the subcontractors had exceeded the NTE amount.

On December 3, 2012, Barker sent Raytheon an email, stating: "Here is the revised Government position on the UAE downward adjustment. Please let me know if you have any questions." The email included a spreadsheet showing a downward adjustment of $5,343,455 which was initially created by Raytheon and then revised by Gary Porter of the U.S. Air Force. There is no indication that the parties had any further discussions on the downward adjustment. Gordon alleges that Raytheon took a wait and see approach. The Air Force employees involved were reassigned and/or left employment with the Air Force. In any event, discussion on the downward adjustment appear to have ceased. The government never issued an actual contract modification reducing the Contract's fixed price, never sent a demand to Raytheon for repayment of any amounts under the Contract, and never claimed any kind of breach of Contract against Raytheon.

Nearly six years after this email, Plaintiff filed his Complaint with this court, alleging that Raytheon had violated the False Claims Act by retaining money purportedly due to the government under the Contract. The United States Attorney's Office for the District of Utah investigated Plaintiff's allegations and requested documents and other information from Raytheon. The United States, however, declined to intervene in the case. Therefore, Gordon is pursuing the claim.

## DISCUSSION

**Raytheon's Motion to Dismiss**

Raytheon seeks dismissal of the First Amended Complaint, arguing that Gordon fails to state a plausible "reverse" false claim under the False Claims Act. Section 3729(a)(1)(G) of the False Claims Act creates liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). An obligation refers to "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id*. § 3729(b)(3). Liability under this provision of the False Claims Act is commonly referred to as a "reverse" false claim.

In order to plead Raytheon's liability for a reverse false claim, Gordon must allege "(1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material; and (4) that results in a claim to the Government or conceals, decreases, or avoids an obligation to pay the Government." *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020). "This circuit has stated that the plaintiff is required to allege that the defendant had an existing legal obligation to pay or transmit money or property to the government." *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006). To determine whether there is an existing legal obligation, the court looks to "whether there is any duty to pay." *United States ex rel. Barrick v. Parker-Migliorini Int'l LLC*, 878 F.3d 1224, 1230-31 (10th Cir. 2017).

Raytheon argues that Gordon has not stated a plausible reverse false claim because he has not demonstrated that Raytheon had an obligation to pay the government based on the Downward

4

Adjustment Clause. An existing duty cannot arise from a contingent or potential obligation that is dependent on a future act. *Id.* at 1231. Although Gordon's First Amended Complaint recites the Contract's Downward Adjustment Clause and attaches the Contract in its entirety, Gordon fails to explain how the Clause created an obligation for Raytheon to pay money to the government.

Under a plain reading of the Clause, Raytheon and the government each had distinct obligations. The Clause obligated Raytheon to notify the government within ten days of the subcontractor's purchase orders being placed. At that point, if the government determined that a downward adjustment of the fixed-price was warranted, the Clause obligated the government to issue a contract modification to reduce the Contract's fixed-price. The Complaint does not allege that Raytheon breached its obligation to notify the government of the purchase orders nor does it allege that the government issued a contract modification to reduce the Contract's fixed-price.

Gordon argues that the Clause did not require a contract modification and, even if it did, the December 3, 2012 email was a de facto contract modification. The Clause states that "[i]t is anticipated that a single contract modification will be issued to reflect the downward adjustment." This language could be read to mean that a contract modification was not required, only anticipated. It could also be read to mean that a contract modification was necessary to implement a downward adjustment, but only one, "single," contract modification was anticipated. The language is not a model of clarity. However, for the government to change the fixed-price amount in the contract, the government had to determine the proper amount of the adjustment. The parties never got past negotiations on their dispute about the proper adjustment.

Gordon argues that when Raytheon's subcontractor negotiated prices came in lower than the estimated NTE prices, Raytheon was obligated to not only notify the government within ten days, but also return the difference to the Air Force. The Clause provides that "the government shall

5

obtain a downward adjustment," "the government shall not be liable or obligated to pay," and "the total contract price shall be reduced in favor of the government." But the language of the Clause references a contract modification would occur and, even if no contract modification was necessary, the government needed to notify Raytheon in some manner that payment was due. Nothing in the Clause suggests that Raytheon was to make payment to the government automatically or that the Clause was self-executing. Raytheon read the Clause as requiring it to incur less costs for subcontract activities than the not-to-exceed ("NTE") amount before a downward adjustment would occur. The Contract did not identify clearly enough how to calculate the proper downward adjustments for Raytheon to automatically know the amount to pay the government. That is exactly why the parties were negotiating whether there should be a downward adjustment. The language of the Clause may make the return of overpayments mandatory, not permissive, but there must be a determination of overpayment before the obligation to make a payment exists. The government never made a final determination of overpayment under the Clause and never made a demand to Raytheon for payment.

Gordon asserts that the December 3, 2012 email was a de facto contract modification and refers to the email as an "end demand for payment." But the email specifically states that it is providing the government's "revised position" on the proper downward adjustment, not a "final position" or notice of an actual contract modification. Nothing in the email suggests that the government's position was final. It invites Raytheon to ask questions. Despite the parties' negotiations regarding the proper downward adjustment, the government never clearly established that it intended to modify the contract pursuant to its "revised position." And, importantly, the email did not request payment.

Gordon's assertion that the email could be a de facto modification is contradicted by the

6

relevant Federal Acquisition Regulations concerning modifications to government contracts.  FAR § 43.301(a)(1).  "The Standard Form 30 (SF 30), Amendment of Solicitation/Modification of Contract shall . . . be used for . . . [a]ny other unilateral contract modification issued under a contract clause authorizing such modification without the consent of the contractor."  *Id.*  The relevant federal regulations under FAR would require more than an email like the one in this case to modify a contract.  *Id.* § 43.201(c). The email did not contain any of the necessary information.  Therefore, the email could not be considered a de facto Contract modification.

An obligation to pay is not at all clear from December 3, 2012 email.  Raytheon's potential obligation to pay money to the government was merely contingent and never established.  An obligation under the False Claims Act must be an established duty to pay.  The December 3, 2012 email did not establish a duty to pay.  The government could have established a legal obligation for Raytheon to pay money under the Clause by issuing a Contract modification to Raytheon or by issuing a 'contracting officer's final decision,"  known as a "COFD," under the Contract's Disputes Clause, but the government did not take either action.  Moreover, the First Amended Complaint does not allege that the government's December 3, 2012 email constituted a Contract modification or a COFD.  At best, the December 3, 2012 email demonstrates a potential obligation to pay money to the government if the government had made a final determination on the downward adjustment. Gordon, therefore, cannot plausibly allege an essential element of a reverse false claim.

Gordon argues that Raytheon should be liable under the False Claims Act because Raytheon made no attempt to dispute the government's position or respond.  The Federal Acquisition Regulations require a party to follow up with the government if they think there is a contract change. FAR § 43.104.  The FAR regulations Gordon cites are not part of the Contract.  The Contract incorporates a different FAR provision for its "Changes Clause."  That regulation, the Contract's

Changes Clause, requires a contractor to assert its right to an equitable adjustment if the government makes a change to the contract and such change causes an increase or decrease in the cost of, or time required for performance of any part of the work. Far from triggering a duty on the part of Raytheon to follow up with the government, the Contract's relevant Changes Clause actually affords Raytheon certain contractual protections, none of which are relevant here.

Although Gordon spends significant time asserting that Raytheon should have responded to the Air Force's December 3, 2012 email setting forth the government's revised negotiating position, it misses the point that the downward adjustment attached to the email was only a potential obligation. A reverse false claim can only occur when a defendant "knowingly and improperly" avoids an obligation to pay money to the government. 31 U.S.C. § 3729(a)(1)(G). "Knowingly" means that a person has actual knowledge that information is false or acts in deliberate ignorance of or in reckless disregard for the truth or falsity of the information. *Id.* § 3729(b)(1). Gordon, therefore, was required to plead with particularity how Raytheon's conduct in avoiding an existing obligation was knowing and improper. A good faith contract dispute is not improper or fraudulent. A decision to "wait and see," even if that is what occurred, is not improper or fraudulent when the government has the authority to make a unilateral contract modification. Nothing Gordon alleges about Raytheon's conduct is tantamount to fraud.

Gordon fails to establish that Raytheon had an obligation to pay money to the government. Gordon's reliance on one email between Raytheon and the government, during obvious negotiations on whether a downward adjustment was necessary, is plainly insufficient on its face to establish an actionable obligation under the False Claims Act. The Contract's downward adjustment clause was not self-executing. The email was not an actual contract modification or a de facto contract modification. A reverse false claim cannot hinge upon a contingent obligation. *United States ex*

*rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230-31 (10th Cir. 2017). Raytheon and the government's unresolved contract dispute is not a plausible basis for a cause of action under the False Claim Act. The court, therefore, grants Raytheon's motion to dismiss Gordon's First Amended Complaint.

Gordon requests that the court not dismiss the action with prejudice because he could more specifically detail the alleged fraud in another amended complaint. However, Gordon has not alleged that Raytheon had a duty to pay money to the government. Neither the Clause nor the email established that Raytheon had a legal or contractual obligation to pay money to the government. Therefore, the court concludes that amending the First Amended Complaint would be futile. *Chase v. Divine*, 543 F. App'x 767, 769 (10th Cir. 2013) ("if a complaint fails to state a claim and amendment would be futile, dismissal with prejudice is appropriate"). Accordingly, the court denies Gordon's request for leave to file an amended complaint and dismisses the action with prejudice.

## CONCLUSION

Based on the above reasoning, the court GRANTS Raytheon's Motion to Dismiss Plaintiff's First Amended Complaint [ECF No. 41] and dismisses this action with prejudice. The court is initially filing this Memorandum Decision and Order under seal because Raytheon's Motion to Dismiss was filed under seal. The court requests that the parties notify it within ten days of the date of this Memorandum Decision and Order as to whether the decision may be unsealed.

DATED this 16th day of December, 2020.

BY THE COURT:

Dale A. Kimball,
United States District Judge